614 So.2d 804 (1993)
John F. STUART d/b/a J & L Tomato Farms, Plaintiff-Appellee,
v.
HAUGHTON HIGH SCHOOL, Bossier Parish School Board, and General Accident Insurance Company of America, Defendants-Appellants.
No. 24480-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1993.
*805 Roland V. McKneely, Jr., Bossier City, for defendants-appellants.
Robert W. Cook, Haughton, for plaintiff-appellee.
Before MARVIN, LINDSAY and WILLIAMS, JJ.
WILLIAMS, Judge.
The Bossier Parish School Board appeals an interlocutory judgment granting injunctive relief to John F. Stuart. The trial court ordered the defendant to cease and desist all baseball practice activities and games at the Haughton High School baseball field. For the reasons expressed below, we reverse the trial court's judgment and vacate the preliminary injunction.

FACTS
The Bossier Parish School Board has maintained a baseball field at Haughton High School since 1962. The field is used for Haughton High School organized athletics and physical education programs. It is also used for other organized league games, including Little League games.
In 1988, John Stuart and his wife became the owners of property adjacent to the baseball field. The property is located east of the field and apparently adjoins the high school property along the right field fence. Mr. Stuart knew of the adjacent ball field at the time he and his family moved onto the property in the fall of 1988. However, Mr. Stuart asserted that until 1991, very few baseballs came across the fence onto his property. It was not until the spring of 1991 that Mr. Stuart claimed he was "just bombarded with balls." After the 1991 baseball season ended, he took 25 baseballs to school officials, informing them that he was concerned about baseballs hitting him and the members of his family, and that he was also planning to construct a hothouse on his property in the fall of that year.
After consulting a lawyer, Mr. Stuart proceeded with construction of a controlled environment hothouse in the fall of 1991. The covering of the hothouse consisted of two layers of plastic sheeting with an air space in between for insulation. Mr. Stuart located his hothouse approximately 30 feet from the fence adjacent to the baseball field. When construction was completed, Mr. Stuart began growing tomatoes hydroponically in the controlled environment which allowed year-round tomato production.
In the latter months of 1991, Mr. Stuart collected baseballs which he found on his property, refusing to return them to players on the school ground. This action caused some friction between the players and Mr. Stuart. He continued this practice in the early months of 1992, and balls which he collected later were introduced into evidence at trial in April 1992. One bag of balls, identified as plaintiff's exhibit 4, contained five balls. Mr. Stuart testified that these balls were collected in February and March of 1992. One of those balls, found by Mr. Stuart on February 11, had penetrated the outer plastic layer of the hothouse and was found resting between the two sheets of plastic. Mr. Stuart testified that a hole in the plastic sheeting could cause the loss of the entire tomato crop as the result of a sudden change in temperature, or a contamination of the hydroponic solution by rainfall entering through the puncture.
The other bag of balls, introduced into evidence as plaintiff's exhibit 3, contained thirteen baseballs and a golf ball. Although the testimony is somewhat unclear with respect to when these balls found their way onto Mr. Stuart's property, his testimony that only four baseballs came onto his property in April 1992 indicates that most of the balls comprising plaintiff's *806 exhibit 3 went over the fence during the latter months of 1991 and perhaps January 1992. The four balls hit over the fence in April were homeruns hit during games. Overall, the evidence indicated that although baseballs were continuing to come across the fence, their number had decreased significantly from spring of 1991 to spring of 1992.
The Haughton High School baseball coach testified that after the hothouse had been finished, Mr. Stuart informed him that when the next ball hit on Mr. Stuart's property, he was going to "shut it down". As a result, the coach testified that he had gone to "extreme measures" in 1992 to keep baseballs from going out of the ball field. He further testified that at organized baseball practice at Haughton High School, there had not been one ball hit out in 1992.
Mr. W.T. Lewis, Superintendent of the Bossier Parish School Board, testified that the school board had taken action in response to Mr. Stuart's complaints. He stated that utility poles had been transported to the campus at Haughton High School, and that as soon as the ground was dry enough SWEPCO gratuitously would install the poles from which a net could be hung. Mr. Lewis also testified that the purchasing director for the school system already had ordered the net.
Additionally, there was some inconclusive testimony concerning a possible dispute as to where the property line between the two properties ran, and concerning whether Mr. Stuart had timber on his property cut which might have served as a natural protective barrier to baseballs.
After trial of this matter, the district court rendered judgment finding that the plaintiff suffered trespass on his property caused by baseballs that were either batted and/or thrown from defendants' ballfield onto plaintiff's property and that defendants failed to take the necessary steps to prevent the trespass. The court found Mr. Stuart's action was in the nature of a possessory action, and that real rights had been violated. The court noted that possession of the adjacent tracts for more than one year was undisputed, regardless of any dispute over ownership. Because the court found that possession or enjoyment of a real right had been disturbed, the court concluded injunctive relief was available and appropriate. Furthermore, although the court observed that there was no requirement for a showing of irreparable harm, the court believed irreparable harm had been proven because Mr. Stuart's entire commercial operation could be destroyed. Accordingly, the court issued a preliminary injunction. In fashioning the injunctive relief, the court noted that Mr. Stuart's counsel had offered to delay the injunction until the completion of the baseball season in order to not harm Haughton High School's chances in the baseball playoffs. The court also noted that while the threat of damage to Mr. Stuart's property was real, the threat was reduced because of the coach's efforts to minimize fly balls over the fence during practice, and because the regular baseball season would end no later than May 9, 1992, with few playing dates remaining at Haughton High School. Additionally, the trial court noted there was a good chance that with the ground then being dry the defendant might be able to persuade SWEPCO to erect the utility poles immediately or within a matter of days.
The written judgment issued pursuant to the trial court's opinion initiated the injunction on May 10, 1992, or at the end of the Haughton High School baseball playoffs, whichever occurred earlier. The judgment also required that the court be notified upon the completion of the pole erection and net installation in order that the court could entertain a motion to dissolve the temporary injunction. Notably, the judgment did not require Mr. Stuart to furnish security of any kind.

DISCUSSION
The provisions of Article 3610 of the Louisiana Code of Civil Procedure state:
A temporary restraining order or preliminary injunction shall not issue unless the applicant furnishes security in the amount fixed by the court, except where *807 security is dispensed with by law. The security shall indemnify the person wrongly restrained or enjoined for the payment of costs incurred and damages sustained.
(Emphasis added.)
In Cochran v. Crosby, 411 So.2d 654 (La.App. 4th Cir.1982), a preliminary injunction issued without security being furnished as required by Article 3610. Because there was no law dispensing with security under the facts of that case, the preliminary injunction was held invalid, the district court's decision was reversed, and the injunction was vacated and set aside. The same result was reached in similar circumstances in Lambert v. Lambert, 480 So.2d 784 (La.App. 3d Cir.1985), and Glass v. Wiltz, 483 So.2d 1248 (La.App. 4th Cir. 1986). In both Cochran and Glass, the court observed that in Jackson v. Town of Logansport, 322 So.2d 281 (La.App.2d Cir. 1985), where a preliminary injunction was issued without security, the matter was remanded to the district court with directions that security be furnished, rather than vacating the injunction. However, the court in Cochran and Glass held that the better approach was to vacate the injunction.
Despite the contrary view expressed by our brethren in Cochran and Glass, this court continues to subscribe to the view that vacating a preliminary injunction is not necessary in all cases in which security has not been furnished. At the same time, we do not hold that vacating an improper preliminary injunction is never the better course of action, and that remand for the furnishing of security is the only option available.
Unlike the situation presented in Town of Logansport in which a bond had initially been posted to obtain a temporary restraining order, and in which there was a continuing threat of damage to plaintiffs' property from road-building activities, the evidence in this case does not indicate that any security ever was required or furnished, and the question of whether injunctive relief still is necessary some nine months later is very much in question.
After the judgment granting the preliminary injunction, the defendant took a suspensive appeal. Under the provisions of LSA-C.C.P. Art. 3612, a judgment granting a preliminary injunction shall not be suspended during pendency of an appeal unless the court in its discretion so orders. Nothing in the record before us indicates that the order granting a suspensive appeal was not entered pursuant to the trial court's discretion, or was an abuse of discretion, and plaintiffs have filed no request for supervisory review of the suspensive appeal order. Accordingly, it appears that for many months there has been no injunction in effect. Nor does the record indicate whether or not the utility poles and net were erected subsequent to the trial court's judgment as anticipated. The suspensive appeal did not prevent the erection of a protective barrier, and it would appear that if a protective barrier were erected, the need for injunctive relief would cease.
Under these peculiar circumstances, we find it appropriate to vacate the preliminary injunction which erroneously was issued without security. Plaintiffs may seek further injunctive relief in the form of a temporary restraining order or preliminary injunction if the circumstances still so warrant. However, it appears that the circumstances should be reevaluated at the present time due to the lengthy period which has elapsed since injunctive relief was first ordered. This is especially appropriate where the trial court judgment plainly showed that the court anticipated the injunction would be of short duration, and where no injunction has been in effect during the pendency of this appeal. In vacating the injunction, we express no opinion concerning the need for injunctive relief, and while erection of a protective barrier appears to be an effective solution, we express no opinion as to who should bear the costs.

CONCLUSION
The judgment of the trial court is reversed, the preliminary injunction is vacated, and the matter is remanded to the trial *808 court. Costs shall be divided equally between appellant and appellees.
REVERSED AND REMANDED.