843 So.2d 1096 (2003)
Marcus Paul DAUPHINE
v.
CARENCRO HIGH SCHOOL and Lafayette Parish School Board.
No. 2002-CC-2005.
Supreme Court of Louisiana.
April 21, 2003.
*1099 Dawn L. Morris, Larry L. Roy, George E. William, Jr., Preis, Kraft & Roy, Lafayette, Counsel for Applicant.
Donald R. Cravins, Jr., Victor J. Versaggi, Domengeaux, Wright, Roy & Edwards, Lafayette, Counsel for Respondent.
KNOLL, Justice.
The writ before us concerns an injunction and contempt proceedings. The two issues presented raise the validity vel non of the temporary restraining order (TRO), and notwithstanding any legal deficiencies of the TRO, whether the criminal contempt conviction based upon a violation of the TRO should be reversed. Specifically, defendants, Dr. James H. Easton, the superintendent of the Lafayette Parish School System, and Dr. Donald W. Aguillard, the principal of Carencro High School, were held in contempt of court for willfully violating a TRO delivered to them by plaintiff's attorney thirty minutes prior to graduation. The TRO directed them to allow the plaintiff, Marcus Dauphine, to "to participate in the graduation ceremonies of Carencro High School scheduled to occur on May 18, 2002, to the fullest extent possible and with all rights and privileges afforded to any and all of the graduates of Carencro High School and be allowed to receive a diploma." For reasons that follow, we reverse, finding legal deficiencies render the TRO invalid, and notwithstanding that defendants could still be held in contempt of an invalid TRO, the record evidence fails to support that Drs. Easton and Aguillard intended to defy the court's authority.

FACTS AND PROCEDURAL HISTORY
On Wednesday, May 15, 2002, Principal Aguillard notified Dauphine's mother that her son was ineligible to participate in the upcoming graduation ceremony scheduled for 2:30 p.m. on Saturday, May 18, 2002, because he was deficient one-half math credit required for graduation; the deficiency occurred as a result of Dauphine's failure to successfully complete one semester of Algebra I during his freshman year in high school.[1] On the afternoon of Friday, *1100 May 17, 2002, Superintendent Easton also telephoned Dauphine's mother to tell her that her son would not be allowed to participate in Saturday's graduation exercises because he failed to satisfy the math requirement needed for graduation. Sometime on Saturday, May 18, 2002, prior to the commencement of the graduation ceremony, Dauphine's attorney obtained a TRO from the Fifteenth Judicial District Court.[2] The order stated, in pertinent part:
IT IS HEREBY, ordered, directed and mandated, in the name of the State of Louisiana and of the Fifteenth Judicial District Court for the Parish of Lafayette, that Marcus Paul Dauphine be allowed to participate in the graduation ceremonies of Carencro High School scheduled to occur on May 18, 2002, to the fullest extent possible and with all rights and privileges afforded to any and all of the graduates of Carencro High School and be allowed to receive a diploma.
A PERSON WHO VIOLATES THIS ORDER MAY BE PUNISHED UNDER LA. R.S. 13:4611 FOR CONTEMPT OF COURT BY A FINE OF NO MORE THAN $1,000.00 OR BY CONFINEMENT OF JAIL FOR AS LONG AS SIX MONTHS, OR BOTH, AND MAY BE FURTHER PUNISHED UNDER THE CRIMINAL LAWS OF THE STAT [SIC] OF LOUISIANA. THIS ORDER SHALL BE ENFORCED BY ALL LAW ENFORCEMENT OFFICERS OF THE STATE OF LOUISIANA.
Although the order bore the signature of a judge of the Fifteenth Judicial District, it contained no reference to the judicial division of the signing judge and the judge's name was not typewritten on the order. Because the order was obtained without having the Clerk of Court open his office on an emergency basis, the order also neither bore a filing stamp from the clerk of court nor the docket number for this proceeding. Although the order was issued on an emergency basis and at a time when the clerk of court's office was not open, the signing judge did not certify a copy of the order for service as provided in LA.CODE CIV. PROC. ANN. art. 251(B).
*1101 Dauphine's attorney testified that he and his law partner delivered the order to Principal Aguillard at the Cajundome.[3] Although the identity of the signing judge could not be deciphered from the signature on the order, Principal Aguillard stated that approximately thirty minutes before graduation, two gentlemen dressed in suits, neither of whom he knew, handed him a folder. At that time, the two gentlemen told him that the folder contained an order signed by Judge Rubin.
After examining the order, Principal Aguillard consulted with Superintendent Easton who was in attendance at the Carencro High School graduation. After conferring with each other and considering that Dauphine did not meet the requisite academic requirements for graduation, they concluded that they would not allow Dauphine to participate in the graduation ceremony. Their decision was further based upon the timing of delivery of the order and suspicions raised in the manner in which the order was presented, i.e., by someone other than a law enforcement official, the document had no court markings such as a docket number and court seal, and the order was illegibly signed.
On the following Monday, May 20, 2002, counsel for Dauphine filed a "Verified Writ of Injunction" with the Lafayette Parish Clerk of Court. At that point, the proceeding was assigned a docket number and was randomly allotted to Judge Byron Hebert. The record shows, however, that shortly after this filing, Dauphine voluntarily dismissed his petition for writ of injunction ostensibly because graduation had passed and no injunctive relief could be provided that would benefit Dauphine.
Additionally, Dauphine formally filed the TRO that Judge Rubin signed on the preceding Saturday, May 18, 2002, and service was made on Principal Aguillard and Superintendent Easton. Contemporaneous with that filing, counsel for Dauphine provided Judge Rubin with a letter that detailed what had transpired when he gave the restraining order to Principal Aguillard and Superintendent Easton just prior to the graduation exercise and further explained that Dauphine was not allowed to graduate. Judge Rubin then issued a sua sponte order, directing Principal Aguillard and Superintendent Easton to appear before his court to show whether they had complied with the TRO issued on Saturday, May 18, 2002.
On May 23, 2002, Judge Rubin conducted a hearing. After Judge Rubin examined the three individuals primarily involved,[4] he held Principal Aguillard and Superintendent Easton in contempt of court for refusing to comply with the TRO. In finding Aguillard and Easton in contempt, the trial judge first determined that it is only within the province of the court to determine the legality of orders and that individuals who choose to act in contravention of a court order place themselves in a precarious position. The trial judge further rejected the assertion of Aguillard and Easton that they could not obey the order because Dauphine simply was not eligible for graduation and compliance with the court order would have required them to violate state law. In discounting this argument, the trial judge *1102 stated that the circumstances of this case would have allowed the school board to grant an exception to the graduation requirements; Judge Rubin based this determination on correspondence he requested from the Board of Elementary and Secondary Education shortly before the contempt hearing. Moreover, the trial judge stated that even if Dauphine had not been granted a diploma, he could nonetheless have been allowed to participate in the graduation ceremony without violating state law. Judge Rubin ordered them to serve fifteen days in jail and to each pay a $250 fine. In lieu of being placed in secured custody, the judge indicated the men would be under the electronic monitoring program.
After applying for supervisory writs and obtaining a stay of the trial court ruling, the Court of Appeal, Third Circuit, recalled the stay and denied the writ application, finding the defendants were required to obey the order until it was stayed or reversed by orderly review.[5]Dauphine v. Carencro High School, et al., KW 02-00590 (La.App. 3 Cir. 6/21/02). We granted the writ application of Easton and Aguillard to consider the propriety of the trial court's ruling. Dauphine v. Carencro High School, et al., 02-2005 (La.11/22/02), 829 So.2d 1053.

LAW AND ANALYSIS

Injunctive Relief
We will first examine the validity of the TRO before we reach the contempt issue. Although this case addresses a TRO, it is important to remember that the underlying action is for an injunction. The TRO, when granted, is issued ancillary to an injunction. LA.CODE CIV. PROC. ANN. art. 3601.
A writ of injunction is a harsh, drastic, and extraordinary remedy and should only issue where the party seeking it is threatened with irreparable loss or injury without an adequate remedy at law. Greenberg v. DeSalvo, 254 La. 1019, 229 So.2d 83, cert. denied, 397 U.S. 1075, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970). Accordingly, LA.CODE CIV. PROC. ANN. art. 3601 provides that an injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law.
During the pendency of an action for an injunction the court may issue a TRO. Id. A TRO serves only as a temporary restraint on the defendant until the propriety of granting a preliminary injunction may be determined, objectively preserving the status quo until that determination. Powell v. Cox, 228 La. 703, 83 So.2d 908, 910 (1955). It is issued preliminary to a hearing and wholly independent from the hearing on a preliminary injunction. Id. A TRO does not determine any controverted right, but issues as a preventative to a threatened wrong and operates as a restraint to protect the rights of all parties involved until issues and equities can be resolved in a proper subsequent proceeding. Id.
Because injunctive relief and the issuance of a TRO are unusual remedies and their issuance should be carefully designed to achieve the essential correction at the least possible cost and inconvenience to the defendant, our Code of Procedure sets specific requirements for their issuance. With regard to the issuance of a TRO without notice under emergency conditions, LA.CODE CIV. PROC. ANN. art. 3603 provides:
*1103 A. A temporary restraining order shall be granted without notice when:
(1) It clearly appears from specific facts shown by a verified petition or by supporting affidavit that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and
(2) The applicant's attorney certifies to the court in writing the efforts which have been made to give the notice or the reasons supporting his claim that notice should not be required.
B. The verification or the affidavit may be made by the plaintiff, or by his counsel, or by his agent.
Elaborating on the notice provisions of article 3603, Comments (a) and (b) state:
This amendment [1985 Acts, No. 204, § 1] changes the requirement for obtaining a temporary restraining order by adding that the applicant's attorney must show the efforts that have been made to give notice or must show why notice should not be required and further that irreparable injury will result before the adverse party or his attorney can be heard in opposition. The intent ... is to reduce the practice of issuing ex parte restraining orders without notice of any kind, and to permit the conduct of some type of adversary proceeding before, rather than after, the issuance of injunctive relief.
With regard to the form and content of the restraining order, LA.CODE CIV. PROC. ANN. art. 3604 provides, in pertinent part:
A temporary restraining order shall be endorsed with the date and hour of issuance; shall be filed in the clerk's office and entered of record; shall state why the order was granted without notice and hearing; and shall expire by its terms within such time after entry, not to exceed ten days, as the court prescribes.
Furthermore, LA.CODE CIV. PROC. ANN. art. 3605 provides:
An order granting either a preliminary or a final injunction or a temporary restraining order shall describe in reasonable detail, and not by mere reference to the petition or other documents, the act or acts sought to be restrained. The order shall be effective against the parties restrained, their officers, agents, employees, and counsel, and those persons in active concert or participation with them, from the time they receive actual knowledge of the order by personal service or otherwise.
Finally, LA.CODE CIV. PROC. ANN. art. 3610 provides:
A temporary restraining order or preliminary injunction shall not issue unless the applicant furnishes security in the amount fixed by the court, except where security is dispensed with by law. The security shall indemnify the person wrongfully restrained or enjoined for the payment of costs incurred and damages sustained.
Applying these codal requirements to Dauphine's petition for injunctive relief and the issuance of a TRO, we find the TRO legally deficient in many respects. Although Dauphine presented the trial court a verified petition, it nevertheless lacked any certification by applicant's attorney of the efforts which had been made to give notice or the reasons supporting his claim that notice should not be required. Likewise, when the trial court signed the restraining order, the court order failed to indicate the date and time of issuance and to set the amount of security for indemnification of the person wrongfully restrained or enjoined for the payment of costs incurred and damages sustained. *1104 Furthermore, the signed TRO was issued without a statement of why the order was granted without notice and hearing.
Although arguably the failure of the trial court to indicate the time and date of issuance only adversely affected Dauphine's interest,[6] the same cannot be said about the other deficiencies. The failure of counsel to certify to the court his efforts to give notice or to certify why notice should not have been required, the absence of language in the temporary restraining stating why the order was granted without notice and hearing, and the trial court's failure to require security, all directly affect Drs. Easton and Aguillard. For reasons elaborated upon more fully infra, not only do these flaws affect the validity of the TRO, they should have been considered in the trial court's determination of the issue of the alleged constructive contempt of Drs. Easton and Aguillard.
At this juncture it is important to recall that Dauphine's attorney delivered[7] the TRO to Drs. Easton and Aguillard only thirty minutes or less before the graduation ceremonies for Carencro High School were to commence. At that time, approximately 240 graduates, their parents, families, and friends were gathered at the Cajundome, awaiting commencement of the graduation ceremony.[8]
Albeit time may have been of the essence because of the events that unfolded in the days just before graduation, it cannot be overlooked that Dauphine was notified of his ineligibility to graduate on the Wednesday preceding commencement exercises and that decision was confirmed on the Friday before the Saturday graduation.[9] As such, the opportunity, though limited, for Dauphine's counsel to provide notification to the appropriate parties of his intended judicial action nonetheless existed. In stark contrast, the petition for injunctive relief is not only void of allegations of attempted notification, there appears no allegation of why notice should not be required. A cursory review of *1105 the requirements for obtaining a TRO reveals that the applicant is required to notify the adverse party of its intention to obtain a TRO before applying or indicate why notice should not be given or what efforts he made to give notice. See John W. Fisk Co. v. Michel, 97-2105 (La.App. 4 Cir. 3/25/98), 709 So.2d 1061, 1064-65. Drs. Easton and Aguillard testified without contradiction that no one gave them advance notice that Dauphine was pursuing judicial intervention to allow him to participate in graduation.
Coextensive with the notice requirement of LA.CODE CIV. PROC. ANN. art. 3601 is the mandate of LA.CODE CIV. PROC. ANN. art. 3604 which requires that the TRO "shall state why the order was granted without notice and hearing." The word "shall" is mandatory. LA.CODE CIV. PROC. ANN. art. 5053; LA.CODE CRIM. PROC. ANN. art. 5; LA.REV.STAT. ANN. § 1:3. In the present case, the court order failed to state why the order was granted without notice and hearing. The trial court's allowance of this legally deficient order provided Dauphine with the opportunity to use the TRO as a means to obtain that which he may have not been otherwise entitled. As we observed in Powell, a TRO is granted to preserve the status quo and it does not determine any controverted right. Powell, 83 So.2d at 910. In the present case, Dauphine's right to participate in graduation and to receive a diploma was controverted. In this regard, pursuant to the requirements of LA.CODE CIV. PROC. ANN. art. 3603(A)(2) the trial court should have denied Dauphine's request for a TRO for failure to certify that notification efforts were undertaken or to allege and certify in writing why notification should not be required.
Moreover, even though LA.CODE CIV. PROC. ANN. art. 3610 dispenses with the need for security in those instances identified by law, e.g., LA.REV.STAT. ANN. § 13:4581, no such dispensation applies to the case sub judice. In Montelepre, Inc. v. Pfister, 355 So.2d 654 (La.App. 4 Cir. 1978), the appellate court ordered the trial court to recall a TRO as improperly issued for failure to require security. The appellate court stated:
[T]he issuance of the temporary restraining order should have been conditioned upon the furnishing of security in an amount fixed by the trial court. The trial court erred in issuing the restraining order without requiring security, and the order is therefore invalid.
Montelepre, Inc., 355 So.2d at 656. See also Glass v. Wiltz, 483 So.2d 1248 (La. App. 4 Cir.1986); Lambert v. Lambert, 480 So.2d 784 (La.App. 3 Cir.1985); Cochran v. Crosby, 411 So.2d 654 (La.App. 4 Cir.1982) (holding that a preliminary injunction should be vacated and set aside if the trial court issues the injunction without security being furnished). But see Lassalle v. Daniels, 96-0176 (La.App. 1 Cir. 5/10/96), 673 So.2d 704, writ denied, 96-1463 (La.9/20/96), 679 So.2d 435, cert. denied, 519 U.S. 1117, 117 S.Ct. 963, 136 L.Ed.2d 848 (1997); Hernandez v. Star Master Shipping Corp., 94-1553 (La.App. 1 Cir. 4/7/95), 653 So.2d 1318; Stuart v. Haughton High School, 614 So.2d 804 (La.App. 2 Cir.1993) and Jackson v. Town of Logansport, 322 So.2d 281 (La.App. 2 Cir.1975) (holding that vacating an improper preliminary injunction is not necessary in all cases issued without security and that in some instances the case should be remanded to the trial court with directions that security be furnished).
Just minutes before the graduation ceremony was about to commence, Drs. Easton and Aguillard were presented with the option of either complying with the TRO, an action they considered beyond their authority because of the BESE and local *1106 school board requirements for graduation, or to halt the graduation ceremony until Dauphine's petition for injunctive relief could be heard on May 24, 2002. The trial court commented in its reasons for judgment that even if Dauphine could not have been presented with a diploma, Drs. Easton and Aguillard could have allowed him to participate in the graduation ceremonies. A review of the TRO shows that Drs. Easton and Aguillard were "ordered, directed and mandated ... that Marcus Paul Dauphine be allowed to participate in the graduation ceremonies ... to the fullest extent possible ... and be allowed to receive a diploma." (Emphasis added). The wording of the TRO certainly indicates that in order to comply with the TRO participation in the ceremony would not have constituted compliancethe granting of diploma was also required. Clearly, had Drs. Easton and Aguillard chosen to halt graduation costs and damages would have been incurred. Thus, we find that the restraining order issued without security was invalid. Montelepre, 355 So.2d at 656; Glass, 483 So.2d at 1248; Lambert, 480 So.2d at 784; Cochran, 411 So.2d at 654.
In reaching this determination, we need not resolve the conflict among the circuits as to the proper disposition when the trial court has not set the amount of security. See Montelepre, Inc. and compare Lassalle, supra. Under the facts of the present case, a remand to the trial court for the setting of security at this time would be fruitless. The graduation ceremony of May 2002 has long passed, Dauphine dismissed his suit for injunctive relief, and he has now satisfied the requirements for high school graduation.
In conclusion, we find the TRO was fatally flawed in multiple respects. Thus, considering the facts of this case, we find the only appropriate course of action is to recognize that the TRO of May 18, 2002, was invalid. Although we find the TRO invalid, our inquiry does not end here. We must further determine if Drs. Easton and Aguillard can be held in contempt of court for having violated this legally deficient order.

Constructive Criminal Contempt
Relying on the timing of the delivery of the TRO, the method of delivery, and the appearance of the TRO, Drs. Easton and Aguillard contend that no reasonable person in the same circumstances would have complied with the order and that they could not have complied with the order.[10] Whether or not a court order is transparently invalid on its face or compliance with the court order could not be accomplished, the trial court was presented the more basic question of whether the elements of the crime of criminal contempt were proven beyond a reasonable doubt. See State in the Interest of R.J.S., 493 So.2d 1199 (La.1986). Finding that the evidence adduced by the trial judge failed to establish beyond a reasonable doubt that Drs. Easton and Aguillard actions were done with an intent to defy the court's authority, we reverse their contempt convictions.
It is a well-accepted principle in proceedings for criminal contempt that orders of the trial judge in the conduct of trials must be obeyed, irrespective of the ultimate validity of the order, unless the trial judge stays the order or ruling to permit a review. City of Lake Charles v. *1107 Bell, 347 So.2d 494, 496-97 (La.1977); Matter of Hipp, 5 F.3d 109 (5 Cir.1993). The correctness of a court order or ruling is not contested by deciding to willfully disobey it, without suffering the consequence of that disobedience. Respect for judicial process is a small price for the civilizing hand of law. Absent a showing of transparent invalidity or patent frivolity surrounding the order, it must be obeyed until stayed or reversed by orderly review. City of Lake Charles, 347 So.2d at 496; see also United States v. Dickinson, 465 F.2d 496 (5th Cir.1972).
As we noted in City of Lake Charles,
The criminal contempt exception requiring compliance with court orders, while invalid non-judicial directives may be disregarded, is not the product of self-protection or arrogance of judges. Rather it is born of an experience-proven recognition that this rule is essential for the system to work. Judges are charged with the final responsibility to adjudicate legal disputes. Determinations take the form of orders. The problem is unique to the judiciary because of its particular role. Disobedience to a legislative pronouncement in no way interferes with the legislature's ability to pass laws. The dispute is simply pursued in the judiciary, and the legislature is free to discharge its responsibilities despite the disregard of its statutes. Law enforcement is also not brought to a standstill by failure to convict those who disregard the unconstitutional commands of policemen.
On the other hand, the deliberate refusal to obey an order of court without testing its validity through established processes requires further action by the judiciary, directly affecting its ability to discharge its duties and responsibilities. While it should be sparingly used, the power of courts to punish for contempt is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the judicial process. Without this authority courts would be mere boards of arbitration whose orders, ruling, judgments and decrees would be only advisory. Dickinson, supra. A court's power to decide includes the power to decide wrongly.
City of Lake Charles, 347 So.2d at 496-97.
The rule that invalid court orders must nevertheless be obeyed until set aside presupposes the existence of at least three conditions: 1) the court issuing the order must enjoy subject matter and personal jurisdiction over the controversy; 2) adequate and effective remedies must be available for orderly review of the challenged ruling, and 3) the order must not require an irretrievable surrender of constitutional guarantees. City of Lake Charles, 347 So.2d at 497.
The Louisiana Code of Civil Procedure defines contempt of court as "any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority." LA.CODE. CIV. PROC. ANN. art. 221. Drs. Easton and Aguillard were convicted of willful disobedience of a court order, which constitutes constructive contempt of court. LA.CODE CIV. PROC. ANN. art. 224(2).
A contempt of court proceeding is either criminal or civil, which is determined by what the court primarily seeks to accomplish by imposing sentence. Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). In a criminal contempt proceeding, the court seeks to punish a person for disobeying a court order, whereas in a civil contempt proceeding, the court seeks to force a person into compliance with a court order. State in the Interest of R.J.S., 493 So.2d at 1202 and n7 (citing Shillitani, 384 U.S. at *1108 364, 86 S.Ct. 1531). In the instant case, the object of the proceeding was to determine whether Drs. Easton and Aguillard should be punished for willfully disobeying the court's May 18, 2002 order, thus it is a criminal contempt proceeding.
Criminal contempt is a crime, and the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal proceeding against conviction of a crime except upon proof beyond a reasonable doubt of every fact necessary to constitute the contempt charge. State in the Interest of R.J.S., 493 So.2d at 1202. On appellate review of criminal contempt, the reviewing court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the contempt charge was proved beyond a reasonable doubt. Id.
Willful disobedience of a court order requires a consciousness of the duty to obey the order and an intent to disregard that duty. Id. at 1203. The purpose of charging and convicting a defendant for criminal contempt is vindication of the public interest by punishment of contemptuous conduct. Id. (citing R. PERKINS, CRIMINAL LAW 533 (1969)). Therefore, in order to constitute willful disobedience necessary for criminal contempt, the act or refusal to act must be done with an intent to defy the authority of the court. Id. (citing E. DANGEL, CONTEMPT § 171 (1939)).
General criminal intent "is present... when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."
Drs. Easton and Aguillard testified that during their years of service to the education system they both received court documents in the course of their respective official duties as superintendent of schools and principal. They both testified that they are familiar with court documents and what they typically look like.[11]
From the outset, we point out that our examination of the TRO shows that the signature affixed to the TRO was illegible and nothing on the document indicates the identity of the issuing judge. It is also obvious that the document presented to Drs. Easton and Aguillard contained no docket number, indicated no reference to the judicial division issuing the order, and bore no endorsement of the fact and date of filing. Though we often take these endorsements for granted, they are not merely embellishments or ornamentations affixed to paper. To the contrary, these endorsements are indicia of court records and signify their character as official pleadings or documents. Although we are keenly aware in the present case that the procurement of this TRO occurred on a weekend at a time when the Clerk of Court's office was closed, LA. CIV.CODE. ANN. art. 251(B) authorizes a judge to certify an order for service in such a situation if it is determined that an emergency situation exists.[12]
*1109 Considering the absence of these aforementioned endorsements from the TRO, the timing of the delivery of the order, and the method of delivery, we cannot say that it was shown beyond a reasonable doubt that Drs. Easton and Aguillard intentionally chose to defy the court order. Although the invalidity of the TRO does not preclude a finding of criminal contempt, when the causes for that invalidity are placed into perspective with the factual setting in which Drs. Easton and Aguillard acted, it cannot be said that it was proven beyond a reasonable doubt that the actions of Drs. Easton and Aguillard were acts of defiance directed to the authority of the trial court. We therefore conclude that the evidence in the record, when viewed in the light most favorable to the prosecution, is insufficient for a rational trier of fact to conclude that Drs. Easton and Aguillard willfully disobeyed the order of the trial court.

DECREE
For the foregoing reasons, the order of May 23, 2002, holding Dr. James H. Easton and Dr. Donald W. Aguillard in contempt of court is reversed, vacated, and set aside. The fines that Dr. James H. Easton and Dr. Donald W. Aguillard paid are ordered reimbursed.
REVERSED, VACATED, AND SET ASIDE.
JOHNSON, J., dissents.
NOTES
[1] Dauphine failed two classes during his four years of high school: one-half year of Algebra I in 1999 and Family & Consumer Science I in 2000. In the Fall of 2001, Dauphine successfully completed a correspondence course entitled Family Life Education offered through Louisiana State University. There is no showing that Dauphine attempted to retake the Algebra I course during the remainder of his high school years. The Louisiana Board of Elementary and Secondary Education (BESE) requires each high school graduate to successfully complete twenty-three (23) hours of course work to become eligible for graduation, one of the requirements being the one-half unit of Algebra I that Dauphine failed. Thus, Dauphine was short one-half math credit for graduation from high school.

One of the allegations raised in Dauphine's petition for injunctive relief is that his guidance counselor told him that with the successful completion of his Family Life course by correspondence he would be eligible for graduation in May 2002. Dauphine alleges that relying upon that information, his mother paid graduation fees and costs on March 9, 2002. Because of the facts of this case and Dauphine's dismissal of his petition for injunctive relief immediately after he was denied participation in graduation, see page 1101, infra, these factual allegations were not proven and tested at a hearing. Accordingly, they remain unproven allegations.
[2] The Rules of the Fifteenth Judicial District Court provide that in a non-family matter docket suit in which there is a request for a temporary restraining order, "the suit must be filed and assigned to a division before any Order may be submitted to a Judge for signature." It further provides that in an emergency situation a judge may enter an order granting a TRO outside his division where the assigned judge cannot be contacted. These rules do not specifically encompass the situation presented in the present case where there was no formal suit filed and allotted to a judge because it was initiated on a weekend. Although the district court rules provide for a duty judge during the weekdays, the rules are unclear if a duty judge is assigned for weekends.
[3] There is no indication that Drs. Easton and Aguillard were provided copies of Dauphine's petition for injunctive relief or any of the supporting documents. At this juncture we also point out that we do not reach the issue of whether such notification was proper. See n7, infra.
[4] The trial court called Dauphine's counsel, Aguillard, and Easton to testify and it questioned them about what transpired at graduation. Dauphine, his mother, and Dauphine's counsel's law partner did not testify.
[5] After the appellate court lifted the stay and denied the writ application, Drs. Aguillard and Easton paid the fine and served fifteen days under house arrest.
[6] See Rabalais v. Hillary Builders, 62 So.2d 846 (La.App. 2 Cir.1953) (holding that "[p]ersons sought to be enjoined or restrained are bound by the order from the time they have notice of the signing of the order, whether service has been made or not." Rabalais, 62 So.2d at 849). Accordingly, the issuing judge's notation of the time and date of issuance would aid the moving party in showing exactly when the TRO became effective.
[7] Because of our resolution of this matter, we do not reach the question of whether the law required service of the TRO by law enforcement officials or whether delivery by an attorney sufficed.
[8] Compare that setting to Dauphine's knowledge that he had failed one semester of Algebra I in his freshman year of high school. Significantly, on April 11, 2002, Dauphine and his mother had notice of the requirements for graduation, including the core curriculum requirements, and they and other anticipated graduates were told in writing as follows:

A student may not receive a Louisiana High School Diploma until all stated requirements are met; therefore, participation in the high school graduation ceremonies are reserved for students who will actually receive a Louisiana Diploma. A copy of the necessary documentation is enclosed for your review.
* * *
Attached is a list of parish guidelines regarding procedures for graduation. Please read the list carefully and sign the form indicating that you have read and understand the guidelines. Any infraction of any of the guidelines may jeopardize your child's participation in this ceremony.
On April 11, 2002, Dauphine and his mother signed receipt of this information and attested that "I have read, understand, and accept the rules and guidelines required in order to participate in the graduation ceremony."
[9] The record contains no evidence of when Dauphine contacted counsel to pursue the petition for injunctive relief.
[10] They also argue that the trial court lacked jurisdiction. We find the trial court was presented with a justiciable controversy at the time Dauphine sought injunctive relief, it likewise had the requisite subject matter and personal jurisdiction to adjudicate that controversy. Although Drs. Easton and Aguillard further contend the TRO was facially invalid, because of our disposition of this case we need not reach that argument.
[11] One of the contentions raised in the hearing was the perception of Drs. Easton and Aguillard that the TRO was part of a hoax. In an attempt to explore that state of mind, their counsel sought to elicit further testimony on this question. Although counsel for Dr. Aguillard attempted to ask what indicia he looked for on those documents, the trial court refused to allow such evidence into the record. As a result of that evidentiary ruling, this line of inquiry was not developed further.
[12] See n7, supra, noting that we do not reach the legal question of how service of a TRO is statutorily accomplished.