STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1286

DONALD F. CARABINE
[AND] ELLEN LELEUX CARABINE

VERSUS

OLIVER DEGRAVELLE, JR.
[AND] GENE SCHEXNAYDER

************

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 91789-A
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy H. Ezell, and James T. Genovese, Judges.

**AFFIRMED.**

**Michael D. Lopresto**
**203 West Main Street, Suite 200**
**New Iberia, Louisiana 70560**
**(337) 367-3561**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**Oliver DeGravelle, Jr. and Gene Schexnayder**

**Carl S. Jolivette**
**The Law Office of Carl S. Jolivette, L.L.C.**
**209 French Street, Suite A**
**Post Office Box 9745**
**New Iberia, Louisiana 70562**
**(337) 381-0642**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
**Donald F. Carabine and Ellen Leleux Carabine**

**GENOVESE, Judge.**

Defendants, Oliver DeGravelle, Jr. (DeGravelle), and Gene Schexnayder (Schexnayder), appeal the judgment of the trial court finding them in contempt of court, awarding Plaintiffs, Donald F. Carabine and Ellen Leleux Carabine (the Carabines), $15,000.00 in damages, issuing a permanent injunction against Defendants, and casting them with costs of court. For the reasons set forth below, we affirm the trial court's judgment in its entirety.

## PROCEDURAL HISTORY

On August 9, 2007, Mr. and Mrs. Carabine filed a Motion for Contempt, Injunctive Relief, Damages, and Attorney Fees (hereinafter referred to as "contempt motion") with the trial court as part of their ongoing lawsuit against DeGravelle and Schexnayder. In their contempt motion, Plaintiffs alleged that the only access to their home was via a sixty-foot-wide right-of-way and passage across Defendants' properties. Plaintiffs alleged that, since they purchased the property in 1996, they have had consistent and unending problems with Defendants harassing, intimidating, and threatening them, and interfering with their daily lives.

Plaintiffs' contempt motion set forth pertinent provisions of a Stipulated Judgment which Plaintiffs and Defendants entered into on November 13, 2006:

h.   Both parties are permanently enjoined from interfering with the other's right of passage down the roadway, or obstructing any party from passage in any way;

i.   Each party is prohibited from obstructing the sixty foot right-of-way, or harassing anyone using the right-of-way;

j.   Each party is prohibited from interfering with anyone using the right-of-way who is a party to the right-of-way agreement, or a family member, agent, or invitee of a party to the right-of-way agreement; and

1

. . . .

n.  All obstructions to the roadway[,] including the home, the oak tree and signs, must be removed by [D]efendants and remediated to its intended purpose at their costs[.]

Plaintiffs claimed Defendants had committed contempt of court by violating the November 13, 2006 Stipulated Judgment through the following actions: (1) by failing to remove signs located at the entrance of the right-of-passage and on either side of the roadway; (2) by DeGravelle continuing to stop and harass vehicles passing on the right-of-way, including Plaintiffs' son, daughter, visitors, waste management vehicles, and even a veterinarian, for the purpose of complaining about speeding and inquiring why the vehicles were there; (3a) by DeGravelle stopping waste management vehicles using the right of passage to reach Plaintiffs' property and telling the drivers that it is "his private property;" (3b) by DeGravelle frequently calling the waste management companies and threatening lawsuits if the companies, for any reason, send another truck down his "private road;" and (4) by Schexnayder, despite being responsible for the maintenance of the non-roadbed portion of the right-of-passage, creating a danger of damage to vehicles en route to and from Plaintiffs' home by allowing the trees on the non-roadway right-of-passage between Schexnayder's and Plaintiffs' to become overgrown and grossly overhang the roadway to the point where the foliage brushes vehicles using that portion of the roadway. Plaintiffs further alleged that Schexnayder threatened them with calling the sheriff, filing lawsuits, or violence for trespassing whenever Plaintiffs attempt to correct the problem. Based on these allegations of contempt, Plaintiffs urged the trial court to find Defendants in contempt of court, to grant their requested injunction, to award them reasonable attorney fees, and to impose a jail sentence on Defendants.

The matter went to trial on February 21-22, 2008. On April 18, 2008, the trial court issued written reasons for judgment, and, on May 6, 2008, the trial court signed a judgment as follows:

> **IT IS ORDERED, ADJUDGED AND DECREED** that [D]efendants' Rule for Contempt, Injunctive Relief and Attorney Fees, filed on August 30, 2007[,] is hereby dismissed at [D]efendants' costs.
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that [D]efendants, Oliver DeGravelle and Gene Schexnayder, are hereby found to be in contempt of court for the willful disobedience of this [c]ourt's lawful order and are each sentenced to serve sixty (60) days in the parish jail. Thirty days of the sentence shall be suspended upon the condition that neither [D]efendant violates any orders of this [c]ourt in the future, relative to the Stipulated Judgment, rendered on November 13, 2006[,] and this judgment. Each [D]efendant will serve thirty (30) days in the parish jail.

Defendants now appeal, alleging insufficiency of the evidence presented to support their convictions. For the following reasons, we affirm Defendants' convictions.

### *Criminal Contempt in a Civil Matter*

Whether a contempt proceeding is criminal or civil depends on whether the penalty is punishment or preventative:

> A contempt of court proceeding is either criminal or civil, which is determined by what the court primarily seeks to accomplish by imposing sentence. In a criminal contempt proceeding, the court seeks to punish a person for disobeying a court order, whereas in a civil contempt proceeding, the court seeks to force a person into compliance with a court order.

*Dauphine v. Carencro High School*, 02-2005, pp. 14-15 (La. 4/21/03), 843 So.2d 1096, 1107 (citations omitted). When the trial court imposed the non-suspended portion of the sentence, thirty days in jail, it was punishing Defendants for disobeying a court order, not forcing compliance therewith. Thus, Defendants' contempt adjudication is, at least in part, a criminal contempt, and criminal contempt is a

crime.[1] *Id.*

### *Statement of Facts*

The trial court wrote detailed Reasons for Judgment setting forth the following pertinent factual findings which we adopt as relevant to its finding of criminal contempt:

> ***Motion for Contempt*:**  The Carabines claim that [D]efendants, DeGravelle/Schexnayder, are in contempt of the . . . Stipulated Judgment, which was signed November 13, 2006 . . . .
>
>    . . . .
>
>    A court judgment[,] which includes a permanent injunction[,] already exists against all parties that prohibits them from stopping, obstructing, or interfering with anyone using the right-of-passage.  The Carabines requested an immediate injunction, *ex parte*, in order to maintain the status quo until the hearing on the above matters, enjoining and prohibiting any party from stopping any vehicle, including but not limited to, vehicles from Allied Waste Services, or any other waste service company contracted by the Carabines.  (*An Order was signed September 21, 2007, which issued a TRO against DeGravelle and Schexnayder, prohibiting them from stopping or harassing any vehicles, and from harassing the Carabines or going near their residence.  The Carabines furnished security in the amount of $10,000.)*  However, the TRO expired ten (10) days later because it was not extended.
>
>        . . . .
>
> The Carabines also ask that DeGravelle/Schexnayder be punished for their contempt to the fullest extent of the law.
>
>        . . . .

---

[1]Louisiana Revised Statutes 13:4611 provides, in pertinent part:

Except as otherwise provided for by law:

(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of a contempt of court therein, as follows:

. . . .

(b) For disobeying or resisting a lawful restraining order, or preliminary or permanent injunction, by a fine of not more than one thousand dollars, or by imprisonment for not more than six months, or both.

## C.   STIPULATED JUDGMENT

Interfering with the other's right-of-passage[,] harassing anyone using the right of way[, and] interfering with anyone using the right-of-way who is a party to the right-of-way agreement, or a family member, agent, or invitee of a party to the right-of-way agreement[,] is prohibited by the previous [s]tipulation and [j]udgment.

Ms. Carabine testified that Oliver DeGravelle has stopped people coming to their residence, including the veterinarian who comes to take care of their animals and various garbage pick-up employees who come to pick up their waste.  This she asserts is in violation of the Stipulated Judgment (Plaintiffs' Exhibit #8).

Chris Dupuis, a Veterinarian, testified that he provides services to the Carabines on a regular basis for their animals.  He testified that he has been stopped by both Oliver DeGravelle and Gene Schexnayder.  In March or April of 2007, he went out to the property to service the animals of the Carabines.  When he was exiting the property of the Carabines, on the right-of-passage, he was stopped by DeGravelle and Schexnayder.  They flagged him down and asked him what he was doing on the right-of-passage.  He explained to them he was servicing the animals of the Carabines.  He further testified that he has been stopped five (5) or six (6) times before by the two of them for inquisition.   He testified that he has had the same vehicle for the last three (3) years and therefore, they know his vehicle and would know that he is the same person who is a Veterinarian that has been servicing these horses.  He testified that they stopped him and did the same inquiry in March or April of 2007.  He testified that they did not speak to him about any speeding and did not tell him anything about speeding.  The purpose of their flagging him down was to discuss what he was doing on the right-of-passage and at the residence of the Carabines.

Britney LeBlanc, a 17 year old friend of Shaina LeBlanc, testified.  Shaina LeBlanc is 18 years old and lives with the Carabines.  Britney testified that she is friendly with Shaina and often goes to the residence of the Carabines to visit with Shaina and/or pick her up.  She stated that she was going to Shaina's house in 2007[,] and Mr. DeGravelle was on the driveway at his residence.  He was flagging her to stop.  It was not in a friendly manner[,] and she was scared.  She testified that she was not speeding.  She had a call to her residence that same day by the police concerning her speeding.  That message was left on her answering machine.  She further testified that DeGravelle has tried to wave her down and stop her a few times other than on that occasion.  On the March 7, 2007 incident, she was alone and was afraid to stop for DeGravelle.

Shaina LeBlanc testified that in 2008, when she was traversing on

5

the right-of-passage, DeGravelle came out of his house and was starring [sic] her down. She testified that she was not speeding and that she was following the speed limit. She testified that on another occasion, she was riding with a friend[,] and DeGravelle came out and starred [sic] them down, even though they were not speeding. She feels intimidated by DeGravelle.

Eddie Romero, an Iberia Parish Government employee, testified. During 2007, he went on the right-of-passage to the property of the Carabines to spray a drainage ditch of Iberia Parish [sic]. He was in a pick-up truck with a trailer carrying a spray tank. The pick-up had the Iberia Parish Council logo displayed thereon. Over the last year, DeGravelle has stopped him twice and asked him what he was doing on the right-of-passage and the property of the Carabines. On another occasion, DeGravelle called the boss of Eddie Romero and complained that Eddie Romero was speeding on the right-of-passage.[2] Eddie Romero testified that every time he goes on the right-of-passage to the back to spray the government drainage ditch near the property of the Carabines, DeGravelle stops him. DeGravelle makes an inquiry of him as to his business each time that he is stopped.

Trevor Ash, the Operations Manager for Waste Management, testified. He testified that through [sic] Waste Management, he contracted with the Carabines for a commercial dumpster at their residence. He testified that Oliver DeGravelle called Waste Management and told Waste Management that this was a private road and that Waste Management could not go down the road.[3] As a result, they stopped service to the Carabines. The Carabines had a two[-]yard dumpster. After the call by DeGravelle stating that it was a private road which he owned, then Waste Management would no longer go on the right-of-passage without having everyone along the road sign a property damage waiver. As a result of the action of DeGravelle, and thereafter DeGravelle and Schexnayder, the Carabines were deprived of the services of Waste Management.

Richard Brown, Jr., of Allied Waste, testified. Mr. Brown testified that he sold a contract to the Carabines in May of 2007. After he sold the pick-up contract to the Carabines, Oliver DeGravelle called Allied Waste and told them that it was a private road and that they were not allowed to go back to the property of the Carabines. Allied Waste[,] therefore[,] terminated their services on June 4, 2007. Prior to the termination of service, the dumpster had been delivered to the residence

---

[2]Mr. Romero denied speeding; he asserted that he had been barely moving.

[3]Waste Management was informed it was a private road "they" owned, and DeGravelle did not want the trucks going down it. On cross-examination, Mr. Ash stated that Defendants did not tell Waste Management it could not use the road; instead, they told the company they did not want it using the road.

of [the] Carabine[s] for Allied Waste to service. Mr. Brown also identified Plaintiff[s'] Exhibit #D-3, a and b, which show the signs that say it is a private road. [When DeGravelle called, he] questioned Brown about the weight of the truck. DeGravelle called Allied Waste on several occasions requesting that [it] remove the containers or dumpsters of the Carabines because they did not have permission to use the private road. Mr. Brown testified that the dumpster was removed because DeGravelle kept calling about removing the dumpster and not using the private road. He and DeGravelle had at least three (3) conversations concerning this. DeGravelle also inquired of him as to the times that the service trucks would go out to the property of the Carabines to service them.

Daniel Naquin, the Director of Operations for [Southwest Disposal, Incorporated (SWDI)], testified. [SWDI] is an operation similar to Waste Management and Allied Waste. [SWDI] does commercial service for garbage in Iberia Parish. [SWDI] had a contract with the Carabines. On December 18, 2007, [Mr. Naquin testified that] he had a call from Oliver DeGravelle about a [SWDI] truck that DeGravelle contended ran over part of his driveway[,] and DeGravelle inquired about the company policy as to damage to property. DeGravelle subsequently obtained a temporary restraining order the next day. DeGravelle said the problem was with the trucks going back to the property of the Carabines. [SWDI] was supplying a two[-]yard dumpster. Upon [DeGravelle obtaining the] temporary restraining order . . . against [SWDI], [SWDI] stopped its service.[4] This was seven (7) months after the Stipulated Judgment on November 13, 2006. See Plaintiffs' Exhibit #8.

Ellen Carabine testified that Gene Schexnayder stopped the waste pick-up. However, she was not more specific and whatever interference this resulted in was not made clear to the court.

Donald Carabine testified that they had a dumpster for two years before the interferenc[e] by DeGravelle. They have animals, feed bags[,] and trash to dispose of every week and need the use of the dumpster. If the Carabines have to go to the public road for the pick-up because the waste companies cannot use the right-of-passage to the residence of the Carabines, it is about one-half (1/2) mile from their residence. This creates a lot of extra work and toil for them to bring all of their refuse to the public road one-half (1/2) mile away. The abuse by DeGravelle and Schexnayder was so bad that it was necessary for the Carabines to obtain a temporary restraining order on August 3, 2007. In

---

[4]The trial transcript shows that Plaintiffs obtained the restraining order against Defendants, and Mr. Naquin did not testify SWDI stopped service once they were informed about the restraining order; instead, SWDI requested DeGravelle submit his request in writing. However, the Carabines testified SWDI called at the end of December to cancel the contract because DeGravelle had called SWDI.

order to obtain the temporary restraining order, they were required to deposit $10,000.00 as security. The restraining order provided that Oliver DeGravelle, Jr. and Gene Schexnayder were not to stop, prevent, or harass any vehicle, including any vehicle from any waste management or garbage pick-up service, [from] traveling along the sixty (60') foot right-of-passage and going to the property of the Carabines. Unfortunately for the Carabines, their temporary restraining order was not extended[,] and a permanent injunction has not yet been issued[,] so the temporary restraining order expired on August 13, 2007. Oliver DeGravelle and Gene Schexnayder were served with the temporary restraining order and knew of the complaint of the Carabines. On December 18, 2007, Oliver DeGravelle called the Director of [SWDI] Waste Management concerning the policy as to damaging of his driveway within the sixty (60') foot right-of-passage. DeGravelle went so far as to get a temporary restraining order the next day against [SWDI]. DeGravelle told Daniel Naquin of [SWDI] that the trucks would have to be responsible for damages to the right-of-way or any other property if they wanted to continue to the residence of the Carabines. [SWDI] had a two[-]yard dumpster contracted to the Carabines. The testimony of DeGravelle asserted that in fact, the paved driveway of DeGravelle extends out into the sixty (60') foot right-of-passage. His complaint of the [SWDI] truck running over part of his paved driveway is as [sic] to that portion of his paved driveway encroaching upon and within the sixty (60') foot right-of-passage. However, this did not stop DeGravelle from calling [SWDI] and raising questions as to their truck damaging his property[, thereby] causing a problem for [SWDI] in using the right-of-passage. Donald Carabine testified that it was necessary for them to incur the expense of an attorney for the temporary restraining order and post the bond in order for them to have trash pick-up.

Donald Carabine testified that Gene Schexnayder had stopped Waste Management. Donald Carabine also testified that Kentwood Water delivers water to their premises, as well as United Postal Service (UPS), but they have stopped as a result of the actions of DeGravelle and Schexnayder. Donald Carabine testified that all of this has interrupted their lives and embarrassed them. It has also made their lives difficult by having garbage pick-up and deliveries stopped.

Oliver DeGravelle testified that he in fact called Trevor Ash with Waste Management. He advised Mr. Ash that their large garbage truck was damaging the road and that they were on private property. DeGravelle testified that[,] thereafter[,] Waste Management pulled the contract.

Oliver DeGravelle also testified that he called Richard Brown, with Allied Waste, [formerly BFI,] about the liability of Allied Waste for any damage to the private road. DeGravelle testified that when

8

Brown found out that this was a private road, Allied Waste pulled the contract with the Carabines. DeGravelle testified that he did not want the trucks on the right-of-passage unless he had some contract or indication from Allied Waste that they would pay for any damage to the private road.

Oliver DeGravelle testified that he spoke to Daniel Naquin with [SWDI] about their use of the private road and damage to the private road and that the truck had passed on his paved driveway. He told them that in case the cement was broken, he wanted them to be responsible. As a result thereof, [SWDI] indicated that they needed a letter from the property owners about the legal status of the right-of-passage. DeGravelle admitted that his concrete driveway goes out into the right-of-way and butts up on the limestone[,] and that is where the truck passed and left track marks on his concrete. DeGravelle is admitting here that his concrete encroaches upon the sixty (60') foot right-of-passage, even to the point where it abuts the limestone provided for passage. DeGravelle testified that as a result of his contacts, Waste Management and BFI requested that the property owners sign damage waivers in order for them to service the Carabine property. DeGravelle testified that he and Gene Schexnayder will not sign the damage waivers to the road and that the Carabines will have to haul their garbage to the highway a half (1/2) mile from their property.

DeGravelle further testified that he sees vehicles going down the right-of-passage on a weekly basis. He testified that he stops these vehicles to determine what they are there for and where they are going. DeGravelle further testified that he stops most vehicles that come down the right-of-passage unless he recognizes the vehicle and questions the drivers as to where they are going and their purpose.

The above testimony and documents in evidence establish[] that there is a predial servitude of passage over sixty (60') feet of the property owned by Gene Schexnayder. The testimony of Oliver DeGravelle also establishes a right-of-passage on his property of sixty (60') feet. These servitudes are for the benefit of the Carabine property. The predial servitudes are established by title[,] and the use and extent of the servitudes [are] regulated by the title by which they are created. Plaintiffs' Exhibit #1 indicates therein that the servitude of passage from Rue de Gravelle to the subject property is sixty (60') feet in width. Therefore, under the law, the Carabines have a right-of-passage to Rue de Gravelle of sixty (60') feet in width. See: Keeley v. Schexnailder, 708 So.2d 838 (3rd Cir., 1998); La. C. C. Art. 697; Ogden v. Bankston, 398 So.2d 1037 (La. 1981). Likewise, when the title provides the exact dimensions of the area affected by the servitude, the title is not silent as to the extent of the servitude. See: Keeley v. Schexnailder, supra[,] and Red River v. Noles, 406 So.2d 294 (3rd Cir., 1981). The owners of the servient estate (DeGravelle and Schexnayder) may do nothing tending

to diminish or make more inconvenient the use of the servitude. La. C. C. Art. 748; Keeley v. Schexnailder, *supra*.

There is no question that the servitude of passage in favor of the Carabines is sixty (60') feet wide.

Plaintiffs' Exhibit #14 is the order granting the temporary restraining order against DeGravelle and Schexnayder prohibiting them from stopping, preventing, or harassing any vehicle, including any vehicles from any waste managment or garbage pick-up service, traveling along the sixty (60') foot right-of-passage and going to the property of the Carabines. Although this temporary restraining order expired on August 13, 2007, since DeGravelle and Schexnayder were served with the proceedings, they certainly were put on notice of their interference with the Carabines' contracts for waste disposal.

Further, Plaintiffs' Exhibit #8, the Stipulated Judgment, permanently enjoined DeGravelle and Schexnayder from interfering with the right-of-passage of the Carabines or obstructing passage in any way. The Stipulated Judgment prohibited DeGravelle and Schexnayder from interfering with anyone using the right-of-way, who is a party to the right-of-way agreement, or a family member, agent, or invitee of a party to the right-of-way agreement. The evidence preponderates that DeGravelle and Schexnayder premeditatedly, intentionally, mean spirited[ly,] and with a desire of interfering with the rights of the Carabines[,] violated the Stipulated Judgment. DeGravelle and Schexnayder took action such as calling and contacting the waste management companies in order to get the waste management companies not to comply with their [contracts] with the Carabines. The tactic that DeGravelle used was advising the waste management companies that it was his private road and that they would be responsible for damages. Then, the waste management companies would tell DeGravelle and Schexnayder that they would have to sign damage waivers to the waste management company to continue serving the Carabines[,] and DeGravelle and Schexnayder would then refuse. They had no right to do this and were prohibited [from doing so] by the [Stipulated] Judgment.

It is obvious that this was all a plan and conspiracy by DeGravelle and Schexnayder to deprive, intentionally and with malice, the Carabines from having garbage service and other delivery services such as Kentwood Water, United Postal Service (UPS), etc. DeGravelle and Schexnayder tried and succeeded in cutting off all service to the Carabines, requiring them to haul all of their garbage, etc., a half (1/2) mile to the public road. This was all in direct violation of the Stipulated Judgment entered into on November 29, 2004, and signed by the Court on November 13, 2006. The testimony reflects that the interference with the waste management companies by DeGravelle and Schexnayder

occurred after the signing of the November 13, 2006 Stipulated Judgment and the rendering of the November 29, 2004 stipulation. This caused the Carabines to obtain the temporary restraining order on August 3, 2007.

Next, the Carabines complain that Schexnayder, in particular, has interfered with their enjoyment and use of the servitude of passage adjacent to Schexnayder's property[,] causing interference, harassment[,] and degradation of the property within the sixty (60') foot right-of-passage.

Donald Carabine testified that the Carabines installed limestone for the road surface of about fifteen (15') feet in width at the center of the sixty (60') foot right-of-passage. Thereafter, Gene Schexnayder began to degrade and damage the right of way. Except for the limestone filled portion of the right-of-way on which the Carabines' vehicles traveled, the remainder of the right-of-way consisted of beautifully maintained grass. The grass had been maintained by Schexnayder on the portion of the right-of-passage which did not have the limestone for passage of the vehicles. Schexnayder had maintained that grass portion of the right-of-passage[,] and it was beautiful and was always cut and maintained. Schexnayder maintained the grass on the sixty (60') foot right-of-passage adjacent to his property. The Stipulated Judgment provided that Gene Schexnayder would be responsible for maintenance of the non-roadbed portion of the right-of-passage[,] and[,] in default thereof, Carabine may maintain that portion of the right-of-way from Gene Schexnayder's driveway to the property of the Carabines. Donald Carabine testified that after he installed the stone portion of the roadbed, Gene Schexnayder would cut the grass portion of the non-stone portion of the sixty (60') foot right-of-passage, but would not get close with his lawnmower to the limestone because it would damage his lawnmower blade. Gene Schexnayder testified to the same thing. Donald Carabine testified that he would raise the cutting edge of his lawnmower and would cut the grass in the areas where the limestone was on the side of the roadbed so that it would have a neat appearance.

Schexnayder testified that he had been maintaining the grass on the non-roadbed portion of the sixty (60') foot right-of-passage running along and adjacent to his property. He testified that he quit passing his lawnmower close to the stones because the stones were damaging his lawnmower. Schexnayder testified that one day Carabine was cutting the grass[,] and Schexnayder became upset with him and told Carabine that he, Schexnayder, was caring for the grass. Carabine disagrees and says that he was only cutting the portion next to the limestone where Schexnayder had not cut. As a result, Schexnayder testified he poisoned the grass on all of the non-roadbed portion of the sixty (60') foot right-of-passage so that Carabine would not come on the property anymore to cut the grass. Schexnayder testified that he did this intentionally.

11

The result of the poisoning of the grass on the non-roadbed portion of the sixty (60') foot right-of-passage from the Carabines' residence along the right-of-passage to the curve going to Gene Schexnayder's property resulted in the grass dying. When it rained, it puddled. After this deterioration began, as a result of the poisoning of the grass by Schexnayder, Schexnayder, and more particularly, his stepson, Jessie Maturin, who lives with him, began riding their four-wheeler up and down and around[,] mostly on the non-roadbed portion of the sixty (60') foot right-of-passage[,] where there was no longer any grass.[5] The constant riding of the four-wheeler on the sixty (60') foot right-of-passage resulted in mud pits being created by the four-wheeler, puddles of water being created by the four-wheeler ruts[,] and by no grass. In general, a degradation of the non-roadbed portion of the sixty (60') foot right-of-passage was undertaken. Coincidentally, this area that was thus damaged by Schexnayder and his stepson is immediately in the front of the property and residence of the Carabines.

Donald and Ellen Carabine testified that Gene Schexnayder and Jessie Maturin continually rode the four-wheeler in this area after the grass was poisoned, creating mud pits, ruts, indentations[,] and holes that would hold the water when it rained.

[Louisiana Civil Code Article] 748 provides that the owners of the servient estate burdened with a predial servitude of passage may do nothing tending to diminish or make more inconvenient the use of the servitude. See: Keeley v. Schexnailder, 708 So.2d 838 (3rd Cir., 1998); Hymel v. St. John the Parish School Board, 303 So.2d 588 (4th cir., 1974); Ogden v. Bankston, 398 So.2d 1037 (La.1981).

The evidence showing that Gene Schexnayder and his stepson, Jessie Maturin, intentionally diminished the use and convenience of the servitude of passage, consist[s] of Plaintiffs' Exhibits #2, #3, #4, #5, #6, Defendants' Exhibit[s] #1, #2, a, b, and c, and most particularly, Plaintiffs' Exhibit #15, being the video tape taken by the Carabines.[6]

---

[5]The record shows that Jessie Maturin does not live with Schexnayder; however, he was "there all the time."

[6]The video shows shallow ruts alongside the road, mostly one or more feet away. There were also at least two large puddles containing standing water. The video progressed to depict several views of two signs, one positioned three to five feet on either side of the roadbed. The video again progressed to show that the puddles with standing water were now two to four feet wide and more than six feet long. Tire ruts were evident in and around the puddles.

The video next showed two different men on four-wheelers at different times circling in the right-of-way. The right-of-way was wet as was evidenced by the standing water covering the area that had the initial puddles. Both men drove around the standing water instead of through it. The video changed scenes to show a man, woman, and child, who were all on the four-wheeler at the same time, as they drove through standing water on their way to Plaintiffs' fence line. As the people reached the fence line, they apparently noticed the camera and operator, they then drove away and, this time, avoided the standing water. The people returned and drove in circles and figure eights

12

Plaintiffs' Exhibits #2, #3, #4, #5[,] and #6, according to the testimony of the Carabines, indicates [sic] the area in the grass non-roadbed portion of the right-of-passage immediately to the front of the Carabines' property. These photographs indicate the condition of the non-roadbed portion of the passage after poisoning of the grass by Gene Schexnayder and the use of the four-wheeler over it. Their actions caused the flooding, rutting[,] and killing of the remain[der] of the grass.

The testimony of the Carabines is that the video, Plaintiffs' Exhibit #15, shows the condition of this same area. It is immediately in the front of the property of the Carabines and adjacent to the property of Gene Schexnayder. It reflects the condition after the poisoning of the grass by Schexnayder and after riding of the four-wheeler over and over again in that area by Gene Schexnayder and Jessie Maturin. The video also shows the arrogance and taunting of Gene Schexnayder and Jessie Maturin as they ride up and down that area on the four-wheeler. They go mostly in the water and mud portions in order to create a mud pit and water pit immediately in front of the property of the Carabines and all along the sixty (60') foot right-of-passage. The intent and desire to diminish the use and convenience of the servitude and damage the non-roadbed portion of the servitude so as to harass and embarrass the Carabines is reinforced by the attitude displayed by Schexnayder and Jessie Maturin as they damage this area in the video.

The intent of Schexnayder and Jessie Maturin, his stepson, is also confirmed when this court compares the condition of the right-of-passage adjacent to and along other property of Schexnayder and property of DeGravelle as reflected in photographs and testimony. Those areas are in great condition and so is the grass. See Defendants' Exhibit #2, a, b, and c. The same is shown by the excellent condition of the right-of-passage along the property of DeGravelle and Schexnayder as reflected in Defendants' Exhibit #3, a and b.

The evidence strongly preponderates that Schexnayder and Jessie Maturin, his stepson, intentionally diminished the use and convenience of the non-roadbed portion of the servitude. The damage prevents the area from being maintained in a reasonable and useful manner. The damage also destroyed the appearance and beauty of the area.

The court finds that Schexnayder and his stepson, Jessie Maturin,

---

right outside of Plaintiffs' fence line.

The video advanced and showed views of the muddy roadbed with some gravel thereon and muddy tracks going onto the roadbed. The final images of the recording showed puddles just outside of Plaintiffs' gate with deep ruts [and] furrows, connecting the newer puddle to the earlier puddles, which have grown in size. The deep furrows in the mud continued through the original puddles, which still contained standing water. The deep ruts were also evident just outside Plaintiffs' gates. The final images also depicted a substantial mud trail that extended a distance onto the gravel roadway.

have interfered with the right-of-passage, being the non-roadway portion of the sixty (60') feet by obstructing or preventing the Carabines from having the use of this area.

The [Stipulated] Judgment also provides that Schexnayder is prohibited from harassing anyone using the right-of-passage. Obviously, this is a harassment of the Carabines[,] as it is intentionally degrading and damaging the area immediately to the front of their residence and all along their right-of-passage.

Schexnayder is responsible for Jessie Maturin, his stepson, because Jessie Maturin resides and lives with Gene Schexnayder. Additionally, the four-wheeler belongs to Gene Schexnayder.

Under the Stipulated Judgment, Gene Schexnayder is responsible for maintenance of the non-roadbed portion of the right-of-way. In default thereof, the Carabines may maintain that portion of the right-of-way from Gene Schexnayder's driveway to the property of the Carabines. What Gene Schexnayder has done here is vacated his responsibility for maintenance of the non-roadbed portion of the right-of-passage by poisoning the grass, creating holding places for water, creating a mud pit[,] and continually and purposely riding the four-wheeler throughout this area in order to degrade and damage that property. In accordance with the Stipulated Judgment, Carabine is now responsible to maintain all of this damaged area. The actions of Schexnayder and his intent to accomplish this is obvious.

The Carabines testified that Gene Schexnayder, in addition, often rides his automobile or truck in the same area causing similar damage and problems in front of the fence at the gate of the Carabine property. The Carabines testified that this is often done by Schexnayder himself.

The Carabines testified that Oliver DeGravelle drives his Jeep in that same area immediately to the left of their gate opening onto the right-of-passage at the front of their property. Their testimony is that when it is wet and muddy, that Oliver DeGravelle will come in his Jeep, immediately in front of their fence, and go up and down that area degrading the area and causing mud pits and water holes on this sixty (60') foot right-of-passage.

DeGravelle testified that the reason he goes back to this area is because he goes to check the drainage ditches. He testified that it is necessary for him to go into that corner with his Jeep so that he can view the drainage or problems with the drainage.

The Carabines have testified, however, that Oliver DeGravelle often rides up and down the right-of-passage immediately in front of their residence whether it is raining or has rained or whatever the

14

weather condition. They testified that he also comes in his Jeep on the right-of-passage roadbed, and sometimes stays there and watches for considerable periods of time immediately in front of their property entrance.

The court notes that the only place to go on this straightaway right-of-passage is from the Schexnayder property onto the Carabine property. There is no other reasons for a person to be on that right-of-passage unless they are going to the Carabine property. Neither Schexnayder nor DeGravelle have property that they can get to by being on that portion of the right-of-passage.

This court finds by preponderance of the evidence that the two are intentionally diminishing the use and convenience of the servitude and [sic] to embarrass and harass the Carabines. All of this is in violation of the Stipulated Judgment and intentional by DeGravelle and Schexnayder.

The court finds that all of these activities have occurred relative to the degradation of the sixty (60') foot non-roadbed right-of-passage after the issuance of the Stipulated Judgment and some of it after the issuance of the temporary restraining order, though it may have been after the temporary restraining order expired by non-renewal.

Obviously, DeGravelle and Schexnayder were made aware of the damage that they were doing and the interference with the right-of-passage and rights of the Carabines[] after the Carabines filed a temporary restraining order. Obviously[,] DeGravelle and Schexnayder were aware of the seriousness of the temporary restraining order obtained by the Carabines, as they were required to post $10,000.00 in security. This is no inconsequential amount of money.

The Carabines have testified that this intentional damage to the non-roadbed portion of the right-of-passage has diminished and made more inconvenient their use thereof because when they and another car, or two cars meet one another on this right-of-passage, one vehicle has to go in the mud and water in order to pass[,] as the roadbed portion of the right-of-passage is only wide enough for one vehicle. Additionally, because of the damage, the costs to maintain [the right-of-passage] by the Carabine[s] has increased.

The Carabines testified that as a result of the poisoning of [the] grass and the creation of water and mud pits by the four-wheelers, that now the four-wheelers go onto or cross the limestone roadbed put down by the Carabines. The four-wheelers carry and bring mud and water and dissipate the limestone roadbed. The Carabines testified that as a result of the increase in mud and water brought by the four-wheelers onto the limestone roadbed, their vehicles are dirtied every time they have to use

15

their right-of-passage and need to be washed.

The Carabines testified that it is very embarrassing for them and guests who come to their home to see Schexnayder and/or DeGravelle riding up and down in front of their residence with no place to go and obviously attempting to harass the Carabines and their visitors.

Ellen Carabine testified that she had to call the companies who service their property in January of 2007 because the limestone portion of the right-of-passage and all of the right-of-passage was too wet and damaged for the trucks to come down the right-of-passage and service their property. This was because of the damage by DeGravelle and Schexnayder.

Schexnayder testified that because he owns the sixty (60') foot right-of-passage subject to the servitude, he has the right to do whatever he wants[,] including the activity with the four-wheelers on the right-of-passage and to use that right-of-passage as he desires.

Donald Carabine testified that Jessie Maturin, more particularly, rides the four-wheeler in the area in controversy everyday, as well as at night, and that he continues to use the four-wheeler to rip up the limestone bed placed there by the Carabines. The testimony of Donald Carabine is that Jessie Maturin is there on the four-wheeler all of the time. He testified that this was in November of 2007, after they obtained the temporary restraining order. He testified that Jessie Maturin, when riding the four-wheeler, goes around in circles immediately in the front of the fence of the Carabines' property in the mud and water, smiling and laughing at them as he does so. He continues to make a bigger and bigger mess. He rides the four-wheeler mostly in the mud and water and not on any portion where there is grass. The deterioration of this area spoken of by Donald Carabine is evident and obvious[,] more particularly in the video.

Donald Carabine testified that[,] if one goes along the right-of-passage along DeGravelle's property, the non-roadbed portion of the property is grassy and manicured[,] and there are no ruts, no water, and no mud there. He testified that no one rides a four-wheeler there. Carabine testified that the non-roadbed portion of the right-of-passage in front of Gene Schexnayder's house is also grassy and that there is no mud, water[,] and/or ruts similar to the area in the front of the Carabine[s'] property.

Donald Carabine testified that there was no water and puddles, but just grass[,] on the non-roadbed portion of the right-of-passage before the grass was poisoned by Schexnayder. Carabine testified that he has seen both Schexnayder and DeGravelle come in their vehicles and go up and down the area where there is a lot of mud and ruts to the

left of his front gate as is shown in the video. They continue to make the area worse and worse. It is obvious that they are deliberately doing this activity in order to harass them. This has been going on since November and December of 2007. The video shows the November and December of 2007 activity. The video was taken over a four (4) week period. Donald Carabine testified that when the grass died and was dissipated, that the limestone stones that he had placed in the roadbed began to dissipate because there was nothing to hold them there.

## *Contempt*

After having set forth the above statement of the relevant facts, the trial court then cited the applicable law, La.Code Civ.P. art. 224(2),[7] and explained the application thereof, as follows:

> Under the jurisprudence of this state, in interpreting [La.Code Civ.P. art. 224], it must be shown by the parties seeking the contempt ruling that the alleged offender willfully disobeyed a direct order of the [c]ourt prior to the contempt rules. One act enumerated as constituting a constructive contempt of court is willful disobedience of any lawful judgment, order, mandate, writ[,] or process of [c]ourt. Willful disobedience is an act or failure to act that is done intentionally, knowingly[,] and purposefully[,] without justification. The [t]rial [c]ourt is vested with great discretion in determining whether a person is to be held in contempt [of court] for willful disobedience of a [t]rial [c]ourt [j]udgment. See: Moises v. Moises, 710 So.2d 1191 (5th Cir., 1998); New v. New, 631 So.2d 1183 (5th Cir., 1994).

> There is no doubt in the mind of this [c]ourt that the [D]efendants, DeGravelle and Schexnayder, intentionally, willfully[,] and in a mean spirit violated the Stipulated Judgment of this [c]ourt. It is the opinion of this [c]ourt that such was proven beyond a reasonable doubt. It is the opinion of this [c]ourt that the violation of the Stipulated Judgment of this [c]ourt by the [D]efendants was willful[ly] and intentional[ly] done for the purposes of embarrassing, humiliating[,] and harassing the Carabines.

---

[7]Louisiana Code of Civil Procedure Article 224 provides, in pertinent part:

A constructive contempt of court is any contempt other than a direct one.

Any of the following acts constitutes a constructive contempt of court:

. . . .

(2) Wilful disobedience of any lawful judgment, order, mandate, writ, or process of the court[. . . .]

17

The Court finds that both Oliver DeGravelle and Gene Schexnayder are in contempt of court for the reasons set forth hereinabove in my Reasons for Judgment as well as set forth here. They are each sentenced to serve sixty (60) days in the parish jail, thirty (30) days of which are suspended upon the condition that they do not violate any orders of this Court in the future relative to the Stipulated Judgment and the Injunction hereinafter granted.

Defendants will serve thirty (30) days in the parish jail each. The other thirty (30) days will be suspended upon the condition set forth above.

## ASSIGNMENTS OF ERROR

Defendants appeal the trial court's judgment, asserting the following five assignments of error:

1. The [t]rial [c]ourt committed legal error in finding the [D]efendants guilty of contempt of the orders of the court for failing to remove signs;

2. The [t]rial [c]ourt committed legal error in finding the [D]efendants guilty of contempt of court for "premeditatedly, intentionally, mean-spirited[ly] and with a desire of interfering with the rights of the Carabines violated the Stipulated Judgment";

3. The [t]rial [c]ourt committed legal error in finding the [D]efendants guilty of contempt for entering into a conspiracy "to deprive, intentionally and with malice, the Carabines from having garbage service and other delivery services such as Kentwood Water, United Parcel Service (UPS), etc. DeGravelle and Schexnayder tried and succeeded in cutting off all service to the Carabines, requiring them to haul all of their garbage, etc., a half (1/2) mile to the public road";

4. The [t]rial court committed legal error in finding that the [D]efendants harassed the [P]laintiffs to an extent which rises to the level of compensatory injury beyond "minimal worry and inconvenience" and granted judgment therefore, or, alternatively, the said damage award was excessive[;]

5. The trial court committed legal error in granting permanent injunctions when (1) [sic] the [P]laintiffs/[A]ppellees offered no evidence to meet their burden of proof[.]

### *Assignments of Error Nos. 1, 2, and 3*

As to the first, second, and third assignments of error, Defendants argue that

18

there was insufficient evidence to support their contempt convictions. Since these three assignments of error all concern sufficiency of the evidence, we will address them together.

Defendants assert that there was insufficient evidence to support a finding that they intentionally, knowingly, purposefully, and without justifiable cause violated a court order by: (1) interfering with Plaintiffs' right of passage down the roadbed; (2) obstructing Plaintiffs' right of passage down the roadbed; (3) obstructing or harassing anyone using the right-of-way; or (4) interfering with anyone using the right-of-way who is a party to the right-of-way agreement or who is a family member, agent, or invitee of a party to the right-of-way agreement.

Defendants allege that there was insufficient evidence to support a finding either that there was intentional interference with the right-of-way usage by Defendants or that Defendants knew the parties involved were parties to the right-of-way agreement or family members, agents, or invitees of Plaintiffs. Defendants point out that the Stipulated Judgment allows Defendants to stop anyone who does not qualify as a party to the agreement or as a family member, agent, or invitee of a party to the right-of-way agreement.

Specifically, Defendants note that the Stipulated Judgment required Defendants to remove obstructions to the roadway and postulate that signs contained in the right-of-way, but outside of the roadway, should not be considered obstructions to the roadway because they were not on the roadway. Defendants urge, moreover, that there is no evidence to support a finding that the remaining signs created an obstruction to the roadway or to the right-of-way. Defendants maintain there was insufficient proof that the signs were on their property because there was no evidence

19

submitted showing the signs were on Defendants property and because there are two additional landowners who each own property in the right-of-way between Defendants.

Defendants also posit that there is no proof to support a finding that they violated the Stipulated Judgment premeditatedly, intentionally, mean-spiritedly, and with a desire to interfere with Plaintiffs' rights. Defendants contend there is no evidence to support the trial court's finding that Plaintiffs had to haul their garbage to the public road. Defendants further allege that the testimony of the witnesses show that they did not prevent them from going onto Plaintiffs' property. Defendants urge this court to find that stopping one person to complain of speeding and stopping others to inquire about their business in the area did not constitute contempt of court.

Defendants claim that the evidence directly contradicts the trial court's finding that their actions have resulted in the cessation of services such as waste management, UPS, and water delivery to Plaintiffs' property. Defendants also allege that the waste disposal companies voluntarily ceased service to Plaintiffs following the refusal by Defendants and the other landowners to grant a waiver of liability required by the companies when DeGravelle complained to the companies concerning the damage being done by the trucks to the roadway. Defendants urge that the complaints were reasonable since Plaintiffs did not assist in paying for the upkeep of the roadway on DeGravelle's property. Defendants also argue that it is their prerogative, as landowners, to refuse to waive liability for damage thereto, and all four landowners refused the waiver.

Defendants also contest the trial court's finding that the poisoning of the grass by Schexnayder on the non-roadbed portion of the right-of-way constituted

20

harassment of Plaintiffs. Defendants point out that it was Schexnayder's stepson who created mud pits in the bare area by riding his four-wheeler up and down the non-roadway right-of-way, and Schexnayder does not have control over his stepson's actions because the stepson is not a minor, he does not live with Schexnayder, and there is no evidence that Schexnayder owned the four-wheeler. Defendants further maintain that Plaintiffs only accused Schexnayder's son of harassing them, not Defendants. Schexnayder professes that he warned his stepson to stay off the roadway portion of the right-of-way.

Defendants further maintain that the non-roadway portion of the right-of-way is rarely used and has never been used by the Plaintiffs or their family. Defendants urge that the non-roadway portion of the right-of-way is only used when two vehicles meet when traveling on the roadway.

***Standard of Review***

The supreme court has set forth the standard for reviewing sufficiency of the evidence, in a case such as this, as follows:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86. Thus, although Defendants contest specific factual findings by the trial court, the specific

21

findings are not the sole controlling factor; instead, the jurisprudence required the trial court to view the evidence in the light most favorable to Plaintiffs in order to determine whether any rational trier of fact could have found the essential elements of contempt to be proven beyond a reasonable doubt.[8]

*Analysis*

"A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. Contempts of court are of two kinds, direct and constructive." La.Code Civ.P. art. 221. "A person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law." La.Code Civ.P. art. 227.

The trial court convicted Defendants of constructive contempt under the following provisions of La.Code Civ.P. art. 224. "Willful disobedience of a court order requires a consciousness of the duty to obey the order and an intent to disregard that duty." *Dauphine*, 843 So.2d at 1108.

The evidence before the court shows that both Plaintiffs and Defendants were involved in a lawsuit wherein a Stipulated Judgment was issued prohibiting all parties from certain acts, specifically:

    h.    Both parties are permanently enjoined from interfering with the other's right of passage down the roadway, or obstructing any party from passage in any way;

    i.    Each party is prohibited from obstructing the sixty foot right-of-way, or harassing anyone using the right-of-way;

---

[8]"On appellate review of criminal contempt, the reviewing court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the contempt charge was proved beyond a reasonable doubt." *Dauphine*, 843 So.2d at 1108.

j.      Each party is prohibited from interfering with anyone using the right-of-way who is a party to the right-of-way agreement, or a family member, agent, or invitee of a party to the right-of-way agreement;

k.      The speed limit on the sixty foot right-of-way is 15 miles per hour;

l.      Plaintiffs will maintain the right-of-way roadbed from Gene Schexnayder's driveway to their property;

m.      Defendant, Gene Schexnayder, will be responsible for maintenance of the non-roadbed portion of the right-of-way; in default thereof, [P]laintiffs may maintain that portion of the right-of-way from Gene Schexnayder's driveway to the property of the Carabines.

n.      All obstructions to the roadway[,] including the home, the oak tree and signs must be removed by [D]efendants and remediated to its intended purpose at their costs[.]

The record reflects that, since the Stipulated Judgment entered into by the parties on November 13, 2006, DeGravelle continued to routinely stop, talk to, question, and otherwise "visit" with the occupants of vehicles on the roadway he did not recognize. The testimony of those people approached by DeGravelle showed they believed DeGravelle's actions constituted hostile interrogations or confrontations rather than "visits."

Evidence presented by Plaintiffs further showed that DeGravelle called at least three trash pickup services hired by the Carabines for their waste disposal for the purpose of keeping the companies off the right-of-way, which, in at least two instances, resulted in the companies canceling the Carabines' contracts. Moreover, the evidence most favorable to Plaintiffs shows that DeGravelle has, on several occasions, called in speeding complaints against people using the road to reach Plaintiffs' property without justification and without proof that they had been disobeying the posted speed limit.

The evidence most favorable to Plaintiffs shows that, after the Stipulated Judgment, Schexnayder both participated in and consented to his stepson's actions in degrading the right-of-way, including the roadway. Schexnayder knew that the four-wheeler used by both he and his stepson was causing ruts in the right-of-way up to the edge of the roadbed. Schexnayder further personally initiated the damage to the right-of-way and roadbed by intentionally killing the grass in the right-of-way as an act of retaliation against Plaintiffs for their attempt to assist in the maintenance of the right-of-way outside of the roadbed.

When the evidence is considered in a light most favorable to Plaintiffs, the evidence shows, beyond a reasonable doubt, both that DeGravelle intentionally harassed, interfered with, and obstructed the Carabines' guests, invitees, and agents in their use of the right-of-way and that Schexnayder intentionally and knowingly obstructed passage on the sixty-foot right-of-way and refused to maintain the area in a manner suitable for use of the servitude. Therefore, Defendants' respective actions constituted a knowing, intentional, and willful disobedience of a court order, the November 13, 2006 Stipulated Judgment. Thus, there is sufficient evidence to support Defendants' criminal contempt convictions. Accordingly, we find Defendants' challenges to the sufficiency of the evidence presented to support their criminal contempt convictions set forth in the first, second, and third assignments of error to be without merit.

### Assignment of Error No. 4

Defendants assign as error the trial court's finding that their actions rose to the level which justified a damage award to Plaintiffs. In brief, Defendants argue "that the award was in error and/or excessive." Further, Defendants contend that the trial

24

court's reliance upon the cases of *Griffin v. Abshire*, 04-37 (La.App. 3 Cir. 6/2/04), 878 So.2d 750, *writ denied*, 04-1663 (La. 10/8/04), 883 So.2d 1018, and *Phillips v. Town of Many*, 538 So.2d 745 (La.App. 3 Cir. 1989), is misplaced.

In support of its $15,000.00 damage award, the trial court stated:

In <u>Griffin</u>, the [c]ourt found that the evidence was uncontradicted that the Abshires had consistently harassed the Griffins over the servitude[-]of[-]passage . . . . The Abshires dug a ditch without the permission of the Griffins . . . for the specific purpose of prohibiting the Griffins from accessing their property from the servitude-of-passage. Additionally, each time Griffin would walk the servitude-of-passage for any purpose, the Abshires would complain to law enforcement authorities that he was trespassing. According to Griffin, this had occurred at least fifteen (15) times . . . .

In <u>Griffin</u>, the [c]ourt found that the defendants were trespassing relative to the rights of the Griffins on their servitude-of-passage. The [c]ourt concluded that one who is wronged by a trespass may recover general damages suffered, including mental and physical pain and anguish, distress[,] and inconvenience.

The [c]ourt in <u>Griffin</u>[] awarded $10,000.00 in mental anguish for the actions of the Abshires.

Another case upon which this [c]ourt relies is <u>Phillips v. Town of Many</u>, 538 So.2d 745 (3rd Cir., 1989). This was also a trespass action. The action involved in <u>Phillips</u> occurred on only one (1) day. The [c]ourt found, however, that the incident cause the plaintiffs considerable embarrassment and humiliation, especially considering the visible presence of the police. The [c]ourt found that the demeanor of the plaintiffs when testifying was that they were genuinely upset and traumatized by the entire event and the loss or damage to their property was believable. The [c]ourt awarded $1,500.00 for mental anguish, embarrassment[,] and humiliation.

This [c]ourt was impressed by the testimony of Mr. and Mrs. Carabine. Mr. and Mrs. Carabine have been harassed, humiliated[,] and inconvenienced as a result of the intentional actions of the [D]efendants (DeGravelle and Schexnayder). The [D]efendants have intentionally sought to embarrass and humiliate the Carabines and have intentionally deprived them of their right to have deliveries, etc.[,] to their property. Additionally, the [D]efendants have intentionally stopped persons going on the road and attempted to stop other persons on the road as a means of embarrassment and humiliation to the Carabines. The [D]efendants have attempted to show the Carabines that despite the [o]rders of the

25

[c]ourt, they are going to continue their harassment and humiliation of the Carabines in the manner in which they act. More specifically, the [D]efendants have not removed the signs that they have been ordered to remove by the [c]ourt. They give some lame testimony as to why they have not removed the signs. However, they have been ordered to remove the signs and have not complied, causing embarrassment and humiliation and inconvenience to the Carabines. The [D]efendants have also harassed the Carabines by interfering with persons using the right-of-passage to go to the Carabines as specified herein by the [c]ourt: the Veterinarian, the Iberia Parish employee[,] and the young woman who has gone out to visit the young woman who lives with the Carabines. More particularly embarrassing and humiliating and causing a tremendous amount of inconvenience[] has been the interference with the trash pick-up and deliveries such as water, etc.[,] to the Carabines. This has caused them a great amount of inconvenience, humiliation[,] and embarrassment. Additionally, the degradation of the property immediately in front of the residence of the Carabines by the [D]efendants in order to make a mud pit out of an otherwise beautified area which is part of the right-of-passage, certainly has been embarrassing and humiliating to the Carabines.

The [c]ourt finds that the actions of [D]efendants, DeGravelle and Schexnayder, have been a conspiracy to cause embarrassment, humiliation[,] and harassment to the Carabines and that they are liable in solido for the mental anguish, pain and suffering, embarrassment, humiliation, and harassment of the Carabines. For all of the actions of the [D]efendants[,] . . . the [c]ourt awards the sum of $15,000.00 for mental anguish, pain and suffering, embarrassment, humiliation, and harrassment, insolido against the [D]efendants, DeGravelle and Schexnayder.

We do not find the trial court's damage award manifestly erroneous, nor do we find the trial court's reliance upon either *Griffin* or *Phillips* misplaced. Having found that there was sufficient evidence presented to support Defendants' criminal contempt convictions, we likewise find that the trial court was correct in employing the same evidence to substantiate its damage award to Plaintiffs. Defendants willfully disregarded and disobeyed the orders of court set forth in the November 13, 2006 Stipulated Judgment. Plaintiffs' peaceful possession was repeatedly disrupted by Defendants' incredulous actions. Under these circumstances, the trial court was not manifestly erroneous or clearly wrong in awarding Plaintiffs $15,000.00 for the

26

humiliation, embarrassment, and harassment experienced by Plaintiffs as a result of Defendants' actions.

***Assignment of Error No. 5***

Finally, Defendants argue that there is no evidence in the record to support the trial court's issuance of a permanent injunction. We disagree. There is ample testimony and evidence in the record which demonstrates the need for a permanent injunction. Pertinent in support of the trial court's decision is the fact that Defendants knowingly and willingly bound themselves to certain obligations through their participation and acceptance of the November 13, 2006 Stipulated Judgment. Without cause, circumspect, or justification, Defendants violated the Stipulated Judgment by interfering with Plaintiffs' daily lives in a consistent and persistent manner. Plaintiffs had to incur the expense of hiring an attorney to obtain a temporary restraining order and post a bond therefor for Plaintiffs to have the benefit of trash pick-up. DeGravelle had no qualms admitting to calling waste companies and complaining about their use of his "private road," and Schexnayder knowingly and willingly rode a four-wheeler creating ruts, all the while taunting Plaintiffs. We find that Plaintiffs need the security and protection provided by a permanent injunction to prohibit Defendants from any further violations of the Stipulated Judgment herein. Therefore, we find Defendants' assignment of error, that there was no evidence in the record to support the trial court's issuance of a permanent injunction, to be without merit.

**DECREE**

The trial court's judgment against Defendants is affirmed in its entirety. All costs of these proceedings are assessed against Defendants, Oliver DeGravelle, Jr.

27

and Gene Schexnayder.

**AFFIRMED.**